IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Sep 27, 2012

| | |
|---|---|
| IN RE:<br><br>**CHRISTOPHER SMART,**<br><br>      Debtor. | Case No. 10-11846-M<br>Chapter 7 |
| **NJL INVESTMENTS, LLC,**<br><br>      Plaintiff,<br><br>v.<br><br>**CHRISTOPHER SMART,**<br><br>      Defendant. | Adv. No. 10-01090-M |

**MEMORANDUM OPINION**

Throughout history, inventors have spent entire lives seeking to unearth their private holy grails. In the Middle Ages, alchemists sought fame and fortune by trying to turn lead into gold. Centuries later, Alexander Graham Bell and Thomas Edison satisfied society's desire for improved communication and greater creature comforts with those iconic inventions, the telephone and the light bulb. More recently, technology pioneers like Bill Gates and Steven Jobs ushered the world into the era of instant communication through the invention of the personal computer and the smartphone, allowing us to instantly follow the fortunes of celebrities and place our innermost thoughts out there for all the world to see, while making a night at the movies far more annoying.[1] All of these people have one thing in common: they did not give their ideas away. Instead, they

---

[1] Haven't we all suffered the misfortune of trying to watch a movie while some less thoughtful person sitting in front of us spent the night talking on the phone, sending text messages, or engaging in a rapturous game of Doodle Jump? I thought so.

reaped the financial rewards one would expect from such revolutionary inventions.

Christopher Smart ("Mr. Smart") spent 13 years of his life inventing a device that, in his own words, would double or triple the gas mileage of every car in America. Imagine what such a product would do for America's dependency on foreign oil, as well as Mr. Smart's financial well-being. In June 2011, Mr. Smart was telling the world about his invention, its effectiveness, and the three patents related thereto, all of which he claimed to own. However, this is not his only story.

On June 1, 2010, Mr. Smart filed a Chapter 7 bankruptcy petition. In his schedules and statement of financial affairs, he claimed no interest in the invention, stating that he had sold all rights to it for less than $30,000. He also claimed no interest in the company that supposedly owns the invention, stating that, while his mother may have owned some interest in the company, he never did. As late as October 2011, Mr. Smart's wife was attempting to obtain an ownership interest in the company. A creditor has cried foul, alleging that Mr. Smart has been less than candid with the Court. Notwithstanding his proclamations to the world, Mr. Smart claims that his statements in the schedules and related documents are the true story, and he is sticking to them. It remains for the Court to determine whether Mr. Smart is entitled to a discharge. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[2] Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a). The granting or denial of a discharge is a "core"

---

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

proceeding as defined by 28 U.S.C. § 157(b)(2)(J).

**Findings of Fact**

The intellectual property at the center of this case is a "Fuel Economizer Vapor System for Internal Combustion Engine."[3] In his marketing efforts, Mr. Smart chose to call the invention "the Economizer." So will we. The Economizer was the result of over 13 years of work by Mr. Smart. He claims to be its sole inventor. Without attempting to engage in technical detail, the Economizer is a device designed to allow a car's engine to burn fuel far more efficiently, resulting (according to Mr. Smart) in a doubling or even tripling of a car's gas mileage with no loss of power, while significantly reducing harmful emissions. Such a device would be to the world of automobiles what the transistor was to radios, or the microchip was to computers. Unfortunately, there is no evidence in the record to suggest that the Economizer actually works.[4]

In retrospect, 2009 was a big year for Mr. Smart and the Economizer. In September 2009, a corporation, Advanced Mileage Technology LLC ("AMT") was formed for the purpose of developing ideas like the Economizer. In the documents that created AMT, Mr. Smart was identified as the "Manager and President" of AMT.[5] He signed various documents on behalf of AMT in his capacity as "Manager and President."[6] Mr. Smart filed an application to patent the Economizer on October 15, 2009.[7]

---

[3] *NJL Exh. 54.*

[4] The Court presumes that if the Economizer were perfected, Mr. Smart would not be here.

[5] *NJL Exh. 47 at 20-24.*

[6] *See, e.g., NJL Exh. 47-20.*

[7] *NJL Exh. 54-2.*

At some point in 2009, Mr. Smart executed and delivered to AMT a document entitled "Confidentiality, Inventions and Non-Competition Agreement," in which Mr. Smart, among other things, sold, transferred, and assigned to AMT all rights in any intellectual property he developed between January 1, 1997, and the date of the agreement.[8]  On December 23, 2009, Mr. Smart executed an assignment of all of his right, title, and interest in the Economizer to AMT for "One Dollar ($1.00) and other good and valuable consideration."[9]  According to Mr. Smart, the "other good and valuable consideration" consisted of payment of fees to patent attorneys engaged by Mr. Smart in pursuit of a patent for the Economizer.  If one believes Mr. Smart, the total amount paid in exchange for the Economizer was $28,491.50.[10]  Mr. Smart testified that the transfer of the Economizer and all of the intellectual property rights related thereto was a good idea in December 2009 because the Economizer did not work, and was, in his own words, "worthless."  As of the trial of this adversary proceeding, the sole asset owned by AMT is the Economizer and the related patents.

The Court heard much evidence on who owned AMT.  Mr. Smart testified that he never owned any interest in AMT and never intended to.  His testimony is contradicted by a series of e-mails generated in August and September 2009, many of which suggested that Mr. Smart would own between 19.50% and 39.00% of the membership interest in AMT.[11]  If one relies upon the e-mails

---

[8] *NJL Exh. 49.*  Although this agreement is dated "as of September 1, 2009," the date of its execution is not part of the record.

[9] *NJL Exh. 53-1.*

[10] *Defendant's Exh. 2-5.*

[11] *NJL Exhs. 56, 57, 64, and 65.*  Mr. Smart objected to the admission of portions of Exhibits 56, 57, and 65 on the basis that they contained inadmissible hearsay.  He raised no foundational objection to their admissibility, nor did he question their authenticity.  In a text order entered prior

between the parties, it appears that the thought that Mr. Smart would own a significant interest in AMT remained unchanged until at least September 9, 2009.[12] The last e-mail in the string, dated September 10, 2009, at 2:05 p.m., indicates that Mr. Smart will own the largest single interest (43.92%) in AMT.[13] At trial, Mr. Smart testified that he was not involved in the determination of any ownership interests in AMT, had no idea how any ownership interest to be attributed to him was calculated, and was "surprised" to find out (ostensibly at the trial of this adversary proceeding) that

---

to submission of written closing argument, the Court overrruled the objection. *See Docket No. 58*. In doing so, the Court relied upon Federal Rule of Evidence 803(3):

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> \*\*\*
>
> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

To the extent the exhibits reflect the plan of the parties in the formation of AMT and the allocation of AMT membership interests, they fall squarely within this exception. In any event, Mr. Smart did not object to Exhibit 64, which contains a direct statement that Mr. Smart is to own a 39% interest in AMT. Moreover, Exhibits 57 and 65 are e-mails authored by Roger Feldman. Mr. Feldman is employed in Massachusetts and, as such, is outside the subpoena power of this Court. *See* Fed. R. Civ. P. 45(c)(3)(A)(ii), made applicable to this adversary proceeding by Fed. R. Bank. P. 9016. Mr. Feldman authenticated these exhibits in a deposition taken on December 7, 2011, in anticipation of the trial of this adversary proceeding. The deposition of Mr. Feldman was received into evidence at trial without objection. Accordingly, there are no hearsay issues with respect to these exhibits, as Mr. Smart had a full and fair opportunity to cross-examine Mr. Feldman at the deposition.

[12] *See NJL Exh. 64.*

[13] *See NJL Exh. 65-1.*

he was to be given such a large interest in AMT.[14]  The Court finds Mr. Smart to be a less than credible witness on this issue.

On September 10, 2009, something changed.  In an e-mail dated September 10, 2009, at 5:03 p.m., Roger Feldman ("Feldman"), a Massachusetts attorney involved in the formation of AMT, sent to Judith Roberts Smart ("Judith"), the mother of Mr. Smart, a subscription agreement that, if properly executed, would result in Judith, and not Mr. Smart, owning 43.92% of AMT.[15]  In the e-mail, Feldman states that the documents were being sent to Judith because Mr. Smart asked that they be sent to her.  While Mr. Smart did not recognize the e-mail, he admitted that the documents were sent to Judith per his request.  Mr. Smart also admitted that the transfer of AMT ownership from him to Judith was done at his instruction.  Even though the documents granting an ownership interest in AMT to Judith were sent to her at his direction, Mr. Smart testified that he had no idea how Judith's ownership interest was arrived at, or what consideration she provided in exchange for that interest.  He later testified that he caused the transfer of ownership to Judith because "she deserved it," having provided funds for the development and patenting of the Economizer.  Judith testified that she contributed nothing to the development of the Economizer, and had no idea how her percentage of ownership interest in AMT was determined.  It is interesting to note that the ownership interest in AMT given to Judith was identical or nearly identical to the ownership interest in AMT originally intended for Mr. Smart.  The obvious conclusion is that Judith received what was originally to be

---

[14]  When Mr. Smart first knew of this proposed interest in AMT is open to question, largely because Mr. Smart repeatedly testified that he had no knowledge regarding the formation of AMT, had no recollection of any of the e-mail conversations between the parties, and no means to refresh his recollection, as it was his practice to delete all e-mails shortly after receipt.

[15]  *NJL Exh. 66.*

Mr. Smart's ownership interest in AMT. After reviewing the evidence, the Court concludes that Mr. Smart's testimony regarding the transfer of ownership interest in AMT to Judith is not credible.

There is another interesting aspect to the AMT ownership documents. Virtually all of the women listed as managers and/or owners, including Judith, took their ownership interests using their maiden names. The documents in evidence contain no explanation for this. Mr. Smart testified that he had no conversations with Judith regarding this fact, and that any information she received came from another individual. Mr. Smart also testified that he personally did not know why the use of maiden names was utilized here. Mr. Smart also testified that his mother at times used her maiden name in business, a charge she denies. Judith testified that it was Mr. Smart who informed her that all of the women owners were using their maiden names when it came to AMT. She also testified that she had not used her maiden name since her marriage to Mr. Smart's father in 1960.

Mr. Smart resigned as President of AMT, effective November 30, 2009. Judith took his place, at least as a matter of record. Judith testified that she performed no duties as the President of AMT, and had no idea why she was chosen to hold the office. According to his testimony, Mr. Smart remained active in AMT, but only in the capacity of the inventor of the Economizer.

While 2009 appeared to be a year of potential for AMT and the Economizer, it was less so for Mr. Smart on other business fronts. One unsuccessful venture involved NJL Investments, LLC ("NJL"), the plaintiff in this adversary proceeding. At the risk of oversimplification, NJL provided $120,000 in financing to a company involving Mr. Smart for the purchase of an oil and gas lease NJL never received. On October 13, 2009, NJL filed a lawsuit in Muskogee County District Court (the "District Court") against Mr. Smart and others styled *NJL Investments, LLC v. Christopher R. Smart et al.,* Case No. CJ-2009-1494 (the "Muskogee Lawsuit") asserting claims for, inter alia, fraud

7

and breach of fiduciary duty. A default judgment was entered against Mr. Smart in the Muskogee Lawsuit on February 3, 2010, awarding NJL actual damages against Mr. Smart and the other defendants in the amount of $120,000 plus prejudgment interest on that amount from June 5, 2009. The default judgment included an Order setting a hearing on NJL's request for an award of punitive damages for March 3, 2010. On that date, a hearing was held and the District Court awarded NJL punitive damages in the amount of $500,000 against Mr. Smart and the other defendants. Thereafter, NJL filed an Application for an Award of Attorneys Fees, and, on April 13, 2010, the District Court entered an Order awarding NJL attorney fees and costs against Mr. Smart and the other defendants in the amount of $16,842.02. The District Court scheduled an asset hearing for Mr. Smart to be held on June 2, 2010. Mr. Smart claimed to have no knowledge of the judgments in favor of NJL until shortly before his bankruptcy case was filed, testifying that various people told him that the matter had been "handled."

AMT and Mr. Smart continued work on the Economizer in 2010. On January 6, 2010, an application to patent the Economizer was filed, listing Mr. Smart as the inventor and AMT as the assignee of all rights to the invention.[16] Various individuals continued to invest money in AMT during 2010.[17] In an interesting development, on June 23, 2010, Judith executed a document entitled "Action by Written Consent of the Managers" in which she agreed to act as the "Executive Vice President" of AMT.[18] The reasons for her actions are unclear.

On June 1, 2010, Mr. Smart filed his bankruptcy case. Sidney K. Swinson ("Mr. Swinson")

---

[16] *NJL Exh. 54.*

[17] *NJL Exh. 126, Deposition of Miles Coleman* at 26.

[18] *NJL Exh. 75-3.*

8

was appointed to serve as trustee in this case. Mr. Smart did not list the Economizer or an interest in AMT as an asset in his bankruptcy schedules. He claimed that he had not worked in over a year. In his statement of financial affairs, Mr. Smart disclosed the December 23, 2009, transfer of all patent rights in the Economizer to AMT.[19] Originally, the amount of consideration paid for the transfer was not disclosed.

The first meeting of creditors was held in Mr. Smart's case on June 28, 2010. At the meeting, Mr. Smart failed to disclose the fact that his mother was an owner, officer, and/or manager of AMT. At the conclusion of the meeting, Mr. Swinson asked Mr. Smart to amend his schedules and statement of financial affairs to provide greater detail regarding his income, as well as his transfer to AMT of all patent rights in the Economizer. Mr. Swinson also requested all documents surrounding the transfer of the Economizer and the payments received by Mr. Smart in exchange for said transfer. Amendments to the schedules and statement of financial affairs were filed on July 19, 2010.[20] Mr. Smart filed additional amendments to these documents on December 22, 2010,[21] and May 19, 2011.[22] At some point in time after July 2010, Mr. Smart provided Mr. Swinson with copies of two checks dated January 5, 2010, and May 25, 2010, in the amounts of $6,286.10 and $18,143.40, respectively, from AMT to the patent law firm engaged by Mr. Smart to obtain a patent on the Economizer.[23] Mr. Smart testified that AMT gave him an additional $3,000 to cover a check

---

[19] *Defendant's Exh. 1-25.*

[20] *Defendant's Exhs. 2 and 3.*

[21] *Defendant's Exh. 5.*

[22] *Defendant's Exh. 4.*

[23] *Defendant's Exh. 10-2 and -3.*

he had previously written to his patent attorneys that was returned for insufficient funds.[24] On September 8, 2010, Mr. Swinson filed his report of no distribution, indicating that he has found no assets available for distribution to creditors.

The only remaining litigation in Mr. Smart's bankruptcy case is this adversary proceeding. NJL has alleged that Mr. Smart's discharge should be denied, or, in the alternative, that the amounts owed to NJL arising out of the Muskogee Lawsuit are not dischargeable. During the course of this adversary proceeding, the parties attempted to obtain court approval of a settlement (the "Settlement"). Under the terms of the Settlement, Mr. Smart agreed to pay NJL the sum of $70,000, in exchange for which NJL would dismiss this adversary proceeding and file a satisfaction of the judgment entered in the Muskogee Lawsuit. A hearing with respect to approval of the Settlement was held on April 5, 2011. On July 7, 2011, this Court rendered a bench ruling in which it declined to approve the Settlement, finding that settlement of an objection to discharge under the terms outlined in the Settlement (namely, payment of monetary consideration to a single creditor) was not permitted.

Work with respect to the Economizer did not stop after Mr. Smart filed his bankruptcy case. By his own admission, Mr. Smart continued his involvement with AMT in his capacity as the inventor of the Economizer. Correspondence received by Mr. Smart in March 2011 shows that additional efforts were being undertaken to obtain patents on the Economizer, with the knowledge and assistance of Mr. Smart.[25] Indeed, in a March 16, 2011, letter from his patent attorneys, Mr.

---

[24] *Defendant's Exh. 10-4.* The three checks total $27,429.50, some $1,062.00 less than the alleged consideration paid by AMT for the Economizer. The discrepancy was never explained.

[25] *NJL Exh. 78.*

Smart was informed that he was "assured of obtaining a patent on your invention."[26] These efforts continued through at least the end of April 2011.[27] On June 21, 2011, Mr. Smart appeared on a radio show hosted by Lee Raburn of KNEWS in Palm Springs, California. In the interview, Mr. Smart affirmatively stated that:

1. The Economizer was developed to the point that it could be installed in an automobile;

2. Once installed, the Economizer would double or triple the gas mileage on any motor vehicle;

3. He (Mr. Smart) held two patents with respect to the Economizer, and was "on his way" to holding a third patent; and

4. The Economizer "will be a solution" to America's dependency on foreign oil.[28]

It is impossible to reconcile these statements with Mr. Smart's testimony that: (1) the Economizer was worthless at the time he transferred his interest in the Economizer to AMT; and (2) he claimed no interest in the Economizer after December of 2009.

After Mr. Smart filed his bankruptcy case, there was significant activity regarding the interest in AMT owned by Judith. Sometime in March 2011, Judith had a falling out with Mr. Smart regarding an unauthorized use of her credit card. On March 21, 2011, Judith sent an e-mail to Mr. Feldman in which she resigned her office in AMT, and asked that all of her interest in AMT be

---

[26] *NJL Exh. 78-2.*

[27] *NJL Exhs. 81 and 82.*

[28] *NJL Exh. 87.*

transferred to Mr. Smart.[29] In early June 2011, Judith signed a document transferring her interest in AMT to Jennifer Vander Lind ("Jennifer"), the wife of Mr. Smart. According to Judith, the document transferring her interests in AMT to Jennifer came to her from Mr. Smart. Judith testified that Mr. Smart informed her that he did not wish to own any interest in AMT, and that Mr. Smart asked Judith to transfer her interest in AMT to Jennifer. Mr. Smart was less than candid when asked about the issue.[30] On July 20, 2011, Mr. Smart authored an e-mail to Mr. Feldman, in which he requested that Mr. Feldman "look into getting those [AMT interests previously owned by Judith] into Jennifer's name," and noting that he and AMT were close to obtaining a third patent related to the Economizer.[31]

Jennifer continued her attempts to obtain recognition of Judith's transfer of AMT interests to her. A series of e-mails were exchanged in which Jennifer demanded that AMT recognize the transfer no later than October 14, 2011.[32] According to Mr. Smart, Jennifer and he threatened to sue AMT to secure the transfer of Judith's interest in AMT to Jennifer. All of these efforts were undertaken at a time when, according to Mr. Smart's testimony, the Economizer, the only asset owned by AMT, was worthless.[33]

---

[29] *NJL Exh. 79.*

[30] By way of example, in a July 19, 2011, e-mail to Mr. Feldman, Mr. Smart stated that he wished to "clean up all my lose [sic] ends..." *NJL Exh. 92.* At trial, he was asked whether these "loose ends" included securing the transfer of Judith's interest in AMT to Jennifer. His only response was that he intended to clean up all of his loose ends with AMT.

[31] *NJL Exh. 94.*

[32] *NJL Exhs. 111, 117 and 118.* These exhibits were also admitted into evidence over Mr. Smart's objection. For an explanation of the evidentiary ruling, *see supra* note 11.

[33] At trial, counsel for NJL and Mr. Smart had the following exchange:

To the extent the Conclusions of Law contain any items that should more appropriately be considered Findings of Fact, they are incorporated herein by this reference.

**Burden of Proof**

NJL asks the Court to deny Mr. Smart a discharge pursuant to 11 U.S.C. § 727(a)(4) and (5). In order to prevail under these sections, NJL must prove each statutory element by a preponderance of the evidence.[34] Once NJL establishes a *prima facie* case for denying his discharge under § 727, the burden of going forward shifts to Mr. Smart.[35] The ultimate burden, however, remains with NJL.[36] In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy

---

| | |
|---|---|
| Mr. Ladner: | It is true though that you and your wife [Jennifer] did threaten to sue the company [AMT], correct? |
| Mr. Smart: | Yes. |
| Mr. Ladner: | So you were threatening to sue the company [AMT] over stock that you didn't own, that you never had an interest in, and that you thought had little or no value. |
| Mr. Smart: | Exactly. |

Trial testimony of Christopher Smart, June 7, 2012, 2:25 p.m.

Mr. Smart was also asked why, if the Economizer was worthless, he incurred over $28,000 in legal fees seeking to patent it. His response was that he was getting the patent "for me. A lot of people do a lot of things for money." Trial testimony of Christopher Smart, June 7, 2012, 3:47 p.m. On redirect examination by his counsel, Mr. Smart changed his tune, stating that the Economizer might have some value if developed, and that he hoped to see it developed. Again, Mr. Smart's testimony is inconsistent and not credible.

[34] *See* Fed. R. Bankr. P. 4005. *See also First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

[35] *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[36] *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

Code must be construed liberally in favor of the debtor and strictly against the creditor."[37] Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[38]

## Conclusions of Law

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]"[39] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[40]

The Fourth Circuit has held that

> [i]n order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[41]

---

[37] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[38] *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

[39] § 727(a)(4)(A).

[40] *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

[41] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[42] Omitted information has been deemed material where it "concern[s] the existence and disposition" of a debtor's property.[43] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[44] The United States Court of Appeals for the Tenth Circuit has provided further guidance in the application of § 727(a)(4)(A), holding that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[45] We have also been instructed that "an honest error or mere inaccuracy is not a

---

an oath and that the oath relates to a material fact.").

[42] *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[43] *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

[44] *Id.* at 955-56. Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2). The United States Court of Appeals for the Seventh Circuit has held that

> [t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted). *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

[45] *In re Brown*, 108 F.3d at 1294.

proper basis for denial of discharge."[46] On the other hand, a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets he or she believed to be worthless.[47]

NJL claims Mr. Smart lied to the Court in his schedules, his statement of financial affairs, and in his testimony regarding his interests in AMT and the Economizer. NJL contends that, at the time of the filing of his bankruptcy case, Mr. Smart continued to have an economic interest in AMT and the Economizer, notwithstanding the fact that he had transferred the rights to the Economizer to AMT, and that his mother, rather than Mr. Smart, held the membership interests in AMT. Mr. Smart denies all of this, and claims that, as early as December of 2009, he had no interest in either the Economizer or AMT. The best way to determine whether Mr. Smart is entitled to a discharge is to compare his testimony with his actions.

Mr. Smart said he never had an ownership interest in AMT. While this may be technically true, Mr. Smart orchestrated the placement of AMT ownership interests in his mother's name, as well as her designation as an officer and manager of AMT. Regardless of the titles she held, Judith had no involvement in the day to day operations of AMT. She was the quintessential figurehead. The Court concludes that Mr. Smart intended for Judith to hold the AMT ownership interests as well as her offices in AMT at his direction and control and for his ultimate personal benefit.

Mr. Smart claims that he had no ownership interest in the Economizer after December 2009. While Mr. Smart may have told this story to Mr. Swinson and the Court, he told an entirely different story to KNEWS. In an interview aired in June 2011, Mr. Smart claimed to own the patents related

---

[46] *Id.* at 1295.

[47] *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

16

to the Economizer.[48] The statement was made at a time when Mr. Smart thought this litigation was behind him, as NJL and Mr. Smart had reached a settlement later disapproved by the Court. One must keep in mind that the litigation between NJL and Mr. Smart was the only thing standing in the way of Mr. Smart's discharge. If this litigation went away, all pre-petition claims against his assets would disappear with it. Mr. Swinson was aware of the transfer of the Economizer to AMT, and chose not to contest it. If Mr. Smart was able to resolve this litigation, he would be free to continue work on the Economizer, and claim any rewards that went along with it.

Mr. Smart claimed the Economizer was worthless at the time he filed this bankruptcy case. His actions speak far louder than his words. He continued to work on the Economizer, remaining active with AMT in the capacity of "inventor." He continued to support efforts to obtain additional patents on the Economizer. He continued to promote the Economizer, telling KNEWS and all of its listeners that the Economizer would double or triple their gas mileage and be the solution for America's dependency on foreign oil. Whether the Economizer will ever work or be perfected is a matter left to the future. However, the evidence before the Court causes the Court to conclude that, at all times relevant to this litigation, Mr. Smart believed that the Economizer could work or did work, and that, as a result, the Economizer had value.

Mr. Smart claimed that AMT had no value. However, in 2011, upon learning that Judith intended to transfer her interests in AMT to him, Mr. Smart resisted the transfer, asking that the interests be transferred to his wife instead. We are given no economic reason as to why Mr. Smart would want his wife to have an interest in AMT. The logical conclusion is that he would be able

---

[48] His exact words were, "I'll tell you right now, ***I currently hold two patents. I'm on my way to my third patent***[.]" *NJL Exh. 87-3* (emphasis added). The statement is unequivocal.

to assert control over AMT if his wife owned a significant interest in the company. When the transfer did not go forward, he and his wife went so far as to threaten to sue AMT to compel the transfer, asking the Court to believe that it was his grand plan to commence litigation to recover property that he didn't own, that he never had an interest in, and that he thought had little or no value. Mr. Smart's testimony is unbelievable.

The Court concludes that, at the time he sought bankruptcy protection, Mr. Smart believed that he held or controlled interests in AMT and the Economizer through his mother's ownership interest and position in AMT. The Court concludes that Judith's involvement in AMT was part of a plan by Mr. Smart to conceal his interests in the company while he was in litigation with NJL and while he was a debtor in this Court. The Court concludes that the bankruptcy schedules and statement of financial affairs do not accurately convey this information, and that the failure to convey this information was intentional. The Court concludes that the failure of Mr. Smart to identify his mother as an owner or principal of AMT at his first meeting of creditors was intentional. The Court finds that Mr. Smart has knowingly and fraudulently made several false oaths in the course of this bankruptcy case, and is not entitled to a discharge. As a result of the finding of a false oath, the Court does not reach any issues under 11 U.S.C. § 727(a)(5).

## Conclusion

Mr. Smart shall not be granted a discharge in Case No. 10-11846-M. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 27th day of September, 2012.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6413.5